The first case for argument is 18-1385 Paice v. Iancu. Mr. Cordell. Thank you, Your Honor. May it please the court, Ruffin Cordell on behalf of Paice. So we are here again on... Is this it or is there more coming? Well, I'm going to urge the court that this should be it. I'm going to ask for a reversal that would prevent us from doing it yet again. This one's a little bit unique, although we have the benefit of having been through this before, and the court did a really nice job of analyzing the technology in the prior opinion. But just to level set where we are, claim one of the 388 patent tells us that we are to limit the rate of change of output torque of the engine to manage emissions. That's what this thing was all about. It was an engine control claim. And then claim three comes in with something that's essentially counterintuitive to that and says that we understand emissions are important. We understand that we're going to control that rate of change of output torque. We're not going to have that black smoke coming out of the top of a tractor-trailer smokestack when it's trying to accelerate. But we've got another problem in a hybrid in that we have to manage the battery. You have to manage the state of charge of the battery. And it doesn't... Why is it nothing, Your Honor, about engine control whatsoever? So there are a myriad of ways that you could manage the problem that Dr. Stein identifies. He says, well, when the battery runs out, you can't use it. And that's true. The problem is that he essentially makes an inherency argument as if it is the only choice. And yet there are many, and the record shows us that there are, and the director has done nothing to rebut that point. So for example, the 970 patent tells us that the way you manage the state of charge of the battery is you simply run the system at a higher power output. And then you arbitrate between devoting that power or torque to the wheels or to recharging the battery. And that's very close to what Vittoni does. So Vittoni has the same power split or torque split mechanism in its ECU. It decides not that we're going to control the engine or the electrical system, the motor and battery, as is appropriate. So here's the issue, and this crops up in a lot of PTAP cases. We've got substantial evidence review. They have an expert, Dr. Stein. The board relied on him. And your answer to that, well, it was too conclusory. So that's kind of like a standard of review piled on the standard of review. I mean, the board decided that it was not conclusory, that it was, you know, substantial. So what are we to do with that? Well, I would urge the court to look closely at what Dr. Stein says. So the entirety of his opinion is in paragraph 194 of his declaration. He repeats it a couple of times, but it's almost verbatim. And that's at appendix 240. And he gives us two sentences. His analysis is two sentences of analysis, and then he gives us two sentences of conclusion. And that's the sum total that the board relies upon. He says that Vittoni discloses that the ECU determines the torque split between the engine and the electric motor based on inputs, including the accelerator pedal, the brake pedal, and the battery SOC. Now, what does that mean? That means that the Vittoni ECU simply decides how much torque to devote to the wheels from the engine versus the electric motor. But that's not the only, start at 238 if we're talking about his discussion of Vittoni, right? Or am I... Well, we can, but he goes on quite a bit about Vittoni. You've picked the conclusory statement, but what precedes that is a discussion of Vittoni that's quite detailed. He does, and he discusses Vittoni, though, in the context of Claim 1. And what he's focused on is whether or not it shows... Wait just for a minute. He's talking about Claim 3, though, starting on page 238, right? He does. Okay, all right. I thought you said Claim 1, so I just wanted to make sure I was following where you were looking. That's right, but I think that what he does here is talks about the utilization of the battery in the context of Claim 1. I guess I should have been very clear. Thank you. And what it talks about here is using the ECU to arbitrate between use of the electrical system versus the mechanical system, the engine versus the motor. That's what he's talking about here. So he does nothing to address engine control. He does nothing to address the rate of change of output torque, which is the key limitation at issue. All he talks about here is that there is an ECU that arbitrates between these two. So I'm through because what he does is simply that. He does two things. That first sentence that I read talks about arbitrating between the ECU and the battery, or the engine and the battery. And then the second sentence says, when the battery is run down, you can't use it anymore. Not a surprising statement. But what he doesn't tell us is how you address that problem. And there are many ways to address that problem. He essentially leaps to his conclusion, saying that it would have been obvious because it's the only way to do it. An inherency or a KSR, you know, the only possible result kind of analysis. But we have none of that in the record. Instead, we have the opposite. We have the 970 patent analysis. Where is the inherency or the only way discussion? Because I'm looking at this and he says, at the very least, it would have been obvious because use of the electric motor is limited or precluded. It's like I'm looking at paragraph 194, unpaged appendix page 241. That's right. But I don't see where that's in. I guess you're looking at the next sentence. Well, I'm sort of looking at both of them together, his conclusion. And the problem that I have is that he could say that if it were the only way. And he's not clear about this. I don't mean to suggest more is in his analysis than actually is. What he simply says is, look, the two statements he makes there at the end of 194 are kind of internally inconsistent. He says it's there. But if it's not there, it would be obvious. And what do you think of his reasoning for why it would have been obvious? He says because use of the electric motor is limited or precluded. Why isn't that sufficient? Because there are, again, a bunch of different ways that you could accomplish that. So just because the electrical system is limited doesn't mean that would automatically leap to adjusting the threshold that's used to limit the torque rate of change. For example, in the 970 patent, what they do is they simply allocate more torque from the engine and less torque from the electric motor in the situation where the electrical system is depleted. And that's very consistent with Vittone. How do you read on page 239 of the appendix? He has that block quote from Vittone about depending on the state of charge of the batteries. How do you read that text that he's relying on there? So I read that in two ways. Number one, that says nothing about how we accomplish the, how we'd solve this problem. It doesn't tell us how we overcome the depleted state of charge of the batteries. And again, if you look at the 970 patent teaching, what it says is the way you deal with this is you just allocate more torque from the engine and less from the motor and have the engine running at a high level at all times. So that would be a completely alternative pathway to solving the problem that he has here. But more importantly, when we asked him about this, he said this has nothing to do with managing emissions. Nothing absolutely to do with Claim 3. He was as explicit as he can be. And there's been a little bit of debate in the briefing about whether or not we were being fair to Dr. Stein, but we asked him as point blank as we possibly could about this. And that's it. So just to make sure I understand correctly, you're saying that this black quote that I'm referring to here, that it it just says that depending on the state of the charge of the batteries, you're going to do something about how you're going to run the electric motor versus the mechanical motor. And, but it doesn't tell you how. And you think that the Claim 3 is very different in the determination of how you're going to deal with that. Exactly. It sets forth a very explicit approach that we're going to adjust the thresholds on the limitation of torque. We're not going to allow the torque to change as rapidly as we might otherwise want to. And that is an approach, and we believe in the best approach. But the prior art shows us that there are many approaches. We all have vehicles where the torque is limited because the electronics do so to manage emissions. And the way most cars do it is they simply tell the driver too bad. You're not going to accelerate as fast as you want to. And that's a perfectly viable approach here as well. When the state of charge of the battery is depleted, you simply tell the driver, sorry you're not going to accelerate as quickly as you'd like. And that's a that's a perfectly, perfectly acceptable approach. So the problem with Dr. Stein's analysis is he leaps to that conclusion and says, well it would have been obvious or would have been there, but he's got to explain why. And the Board acknowledges that his testimony about the paragraph in question in Appendix 239 was not about emissions. It's at page 13 of their opinion. They recognize that he, when he was asked about that particular paragraph, he was talking about the general operation of the vehicle and it had nothing to do with emissions or Claim 3. We even asked him explicitly about Claim 3. So to the extent that he's relying on that, or the Board is relying on it, they need to point to something. They've got to have some kind of substantial evidence. But I can go further. I can demonstrate that Dr. Stein's analysis of the toning in the first appeal demonstrates that in fact it shows nothing about adjusting the threshold. If the Court can bear with me for just a moment. And the Court's opinion at pages 8 and 9 relied on Dr. Stein's analysis of the toning and the figure 8 graph in particular showing that the slopes of the of the torque curve versus time were the same over and over again. And from that Dr. Stein deduced that the rate of change of torque, the threshold for torque change, did not change. So he came to the opposite conclusion of what's required by Claim 3. And it was the linchpin of his analysis. It was the linchpin of what the Board decided. That the way he reads the toning is that it absolutely does not change the threshold values for the rate of change of torque where Claim 3 requires that you do so. So in effect his analysis shows that the toning is going the wrong way. That it shows that you do not change the rate of change thresholds of torque. And that's at I think it's at page 5 of our reply brief, of the gray brief, where we actually do that analysis in very explicit detail. Okay you're in Cherry Fossil, so I'm going to get from the other side. Thank you. Thank you. I'm sorry your honor, it's page 15. I can't read my own hand. Okay. Yeah please, the court. I just want to address, the first thing I'd like to address is my friend here said that the tone says nothing about engine control. And we've already reached that issue in the first time around with Claim 1, in which the Board found that the tone does teach the threshold on the rate of change of torque. And this court affirmed that. So we do know that the tone actually does teach engine control. Where is that in Claim 1? In Claim 1? So if you look at page 6, you can see Claim 1. And at the very end of appendix page 6, you can see that wherein a rate of change of torque output of said engine is limited to a threshold value. And that was one of the issues the first time around here on this appeal. And the Board found and relied a lot on Dr. Stein's figure 8 on page, I think it's 454 of the appendix, showed this threshold on the rate of change of torque through the tone steady state management theory. What do you think figure 5 shows? So figure 5, Dr. Stein did rely also on figure 5. And figure 5 shows is that in this hybrid control system, the battery state of charge, which is sort of on the bottom right of that image, factors into the battery management, which factors into the optimal power management, which considers fuel consumption and emissions, which factors into the overall torque management. And that torque management is what determines the split between the combustion engine and the electric motors. And Dr. Stein relied on that in those paragraphs starting on page 238 of the appendix. Am I correct in understanding that the part of battery charge and how it factors in can be found in Vittoni at page 26, you know, this block paragraph we were talking about earlier, and also this figure 5. But that's pretty much about it. It addresses it expressly in Vittoni. Or is there other disclosure that I should look at? Those are the two main disclosures that Dr. Stein did rely on. There's a little bit on appendix 450 that under, at the bottom, that talks a little bit in general about the management control strategies of the hybrid powertrain. Say on 450, is it that under control system? It's under management strategies of the hybrid powertrain. And it just talks a little bit about figure 5 and what it shows. It says the ECU, the electronic control unit, manages the powertrain on the basis of inputs, including that list of inputs. So it was that page, the depending on the state of charge passage that we've been discussing, and then on page 454, the figure 5 that shows the back over Dr. Stein's testimony. Starting on page 238, Dr. Stein gives us the pathway to go from what Vittoni discloses to his conclusion in paragraph 194. And what he says, starting on page 238, paragraph 190, is that a person of skill in the art would know that when the battery is low, the control system would need to limit the use of electrical loads, especially large ones like the electric traction motor. And so one of skill in the art would have expected to monitor the battery state of charge and modify its use accordingly. I'd also like to just... How does paragraph 190 relate to the conclusion in paragraph 194? So in paragraph 190, Dr. Stein is discussing what a person of ordinary skill in the art would know. And the two important things that he states here is that when the battery is in a low state of charge, the control system will need to limit the use of electrical loads, and in particular, large loads. And the other statement he makes at the end of 190 is that a person of ordinary skill would know to monitor the battery and modify the use of the battery accordingly. So that plays into his conclusion on appendix 240 at paragraph 194, because he says that increasing the very last sentence, increasing the threshold value would be necessary under such a battery state of charge conditions in order to meet the instantaneous torque requirements. So he's saying that the ECU determines the torque split and the battery state of charge is a factor in there. And so one of skill in the art would know to monitor that and modify the torque accordingly. And if there are no further questions, I will yield my time. So if I can just start with the sentence that counsel just read from paragraph 194, that it would be necessary to adjust the threshold in order to solve the depleted state of charge problem. That's the point of deficiency that Dr. Stein falls down on, because he has no support for that whatsoever. And the record shows that there are other approaches that could and have been used in the 970 patent, the Asani patent. I didn't mention that during my first argument, but in appendix 383 and 387, columns 365 through 459, the Asani reference shows that, in fact, the way they deal with this is, again, to run the engine at very high power and either allocate it to the wheels or to the electric motor as needed. At that point, you never need to adjust any kind of a threshold. There is no discussion of threshold. It is not necessary. Dr. Stein has no evidence to support the statement that it is necessary that you adjust those thresholds. If I can go back to the paragraph that we've been debating, it appears in native form at appendix 451, where it talks about, so it's quoted, I'm sorry, from Dr. Stein's declaration, appendix 239, the depending on the state of the charge of the batteries paragraph that we've been discussing over and over and over again. We find it again in its native form at appendix 451, depending on the state of the charge of the batteries. We asked him specifically about that paragraph at appendix 2575. Question, as discussed in this paragraph that starts with depending on the state of the charge of the batteries, and then it goes on from there, and then a question at appendix 2576. So this paragraph from Vittoni, where it states the control system allows also to introduce only the electric traction. That's a continuation of the paragraph I just read. I believe you previously testified that it was your opinion that in this instance, it was only the electric motor that was providing torque and not the engine. Is that correct? Answer, this refers to a particular part of the overall function and behavior of the hybrid vehicle, and it's talking about the effect of the battery charge on the possibility of running the vehicle in the electric mode only, you know, without the engine. That is not related to emission control issues that are talked about in the paragraph below, where Vittoni talks about the steady state management of the thermal engine during transient phases where the torque is being split between the engine and the motor. So I don't think that's what he's describing up here under optimizing consumption and talking about the issue of going into electric mode based on the state of charge the battery has anything to do at all with what is talked about below in, quote, to reduce emissions, close quote, Claim 3, Claim 1.9. Can I ask you, I'm just curious, what's the timing of when he submitted his declaration where he says that this paragraph is relevant to Claim 3 and this testimony that you've identified for us today? It was obviously removed by several months. I can't The declaration goes in with the petition, and then we had the chance to pose him on it. And it would be one thing if he could point to something, but he's here, he's running away from it. He's telling us that that paragraph is related to whether or not you're going to drive in electric mode. That's what the paragraph in question at appendix 239 is talking about. I can't remember whether the board actually addressed this or not in its opinion, did it? They did at page 13, and they seem to acknowledge that the paragraph in question does not apply to emissions. And then they say, well, but, you know, overall, and they kind of do a bit of a gloss there and say overall that we were able to find that someplace. And to me, it really brings us back to a remedy. You know, it is possible for an expert to fill in gaps. It is possible for them to find obviousness just in a broad sense, although again, I guess we have to be careful about that as well. But they've got to have something. I mean, this is a very particular solution. We're going to change the threshold on the rate of change of torque output. And it's only one of many available solutions to the state of charge problem. So he can't say that it's necessary. He can't say that it's inherent. He needs to have more. And just allowing him to give us a, you know, an Ipsy Dixit, it's obvious, not only flies in the face of Arendi, but in Icon Fitness. And if I could, throw one plug in for a reversal. And it was this court's opinion last Friday in the Personal Web case. It harkened back to Judge O'Malley's dissent in the Icon Fitness case, that the patent offices had two tries at this. I think it ought to be a two strikes and you're out approach. So if the court sees fit to side with Pace in this, I'd ask for a reversal. Thank you. Thank both sides in the case.